# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HELEN HUNTER, WILLIAM HUNTER, | : | |
|     Plaintiffs, | : | |
| | : | CIVIL ACTION |
|           v. | : | |
| | : | NO. 08-CV-879 |
| STERLING BANK, W.G. OSBORNE | : | |
| CONSTRUCTION, LLC, WILLIAM G. | : | |
| OSBORNE, THE TITLE COMPANY OF | : | |
| NEW JERSEY, INTERSTATE | : | |
| CONSTRUCTION FUNDING, INC., | : | |
|     Defendants. | : | |
| | : | |

**October _19, 2010**                                                    **Anita B. Brody, J.**

## MEMORANDUM

Plaintiffs Helen and William Hunter (the "Hunters") bring suit against Sterling Bank ("Sterling"), W.G. Osborne Construction, LLC ("Osborne Construction"), William G. Osborne ("Osborne"), The Title Company of New Jersey ("Title Company"), and Interstate Construction Funding, Inc. ("Interstate"), raising six claims: (1) conversion; (2) breach of fiduciary duty; (3) negligence; (4) breach of contract; (5) detrimental reliance; and (6) equitable relief. Sterling counterclaims asserting a breach of contract. Sterling now moves for summary Judgment against the Hunters' Complaint, and in favor of its Counterclaim. For the reasons that follow, I will **GRANT** Sterling's Motion for Summary Judgment against the Hunters' Complaint, and **DENY** Sterling's Motion for Summary Judgment in favor of its Counterclaim.

## I. Background[1]

This case arises out of a joint venture to develop two properties out of a lot at 121 East Rosemary Road, in Wildwood Crest, New Jersey. The Hunters owned this lot, which in 2005 was worth $420,000 and was subject to a $250,000 mortgage. In 2005, the Hunters entered into a joint venture with Osborne Construction, operated by Osborne, to demolish the existing property on the lot, divide the lot into two separate units labeled 121 East Rosemary Road ("Unit 121"), and 123 East Rosemary Road ("Unit 123"), and develop property on both new lots (collectively, the "Property").

Under the Hunters' development plan, they would jointly own title to the Property with Osborne Construction until construction was complete. Osborne Construction would take out a construction loan both to pay off the Hunters' existing mortgage, and to pay for construction on the Property. After construction was complete, Unit 123 would be sold to repay a portion of the construction loan. The Hunters would then take out a separate mortgage on Unit 121, and would use the funds from this mortgage to pay Osborne Construction for sole title to the Unit. Osborne Construction would use part of this sum to pay off the remaining balance of the construction loan.

### A. Closing the Deal

On January 17, 2006, Osborne Construction, Osborne, and the Hunters agreed to terms for a $950,000 construction loan provided by Sterling (the "Loan") that would fund construction

---

[1] For purposes of summary judgment, "the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in [that party's] favor." Hunt v. Cromartie, 526 U.S. 541, 552 (1999) (internal quotations omitted). Where facts are disputed, the Hunters' account of the facts will be taken as true for the purposes of this Motion.

on the Property. The Loan was secured by a first mortgage on the Property. In order to close on the Loan, Osborne Construction, Osborne, and the Hunters signed several documents, including: (1) a Commitment Letter (the "Letter"); (2) a Note with a supplementary Construction Rider (together, the "Note"); (3) a Construction Loan and Security Agreement (the "Construction Agreement"); and (4) a Construction Draw Schedule (the "Draw Schedule"). These documents identified Osborne Construction as the "Borrower" and the "Contractor," and Osborne and the Hunters as "Guarantors."

**1. The Letter**

The Letter outlined the general terms of the Loan, providing:

> The proceeds of this loan will be used solely for the construction of the above captioned property and all construction loan proceeds will be disbursed on an inspection draw basis.

The Letter then detailed the inspection process that would precede each advance under the Loan:

> Inspections will be performed by TEB Associates and all advances will be made for work completed and based on the Bank's construction draw breakdown. ***We do not inspect the quality of the work or whether it is exactly to the plans and specifications you have delivered to us***. Inspections are performed to assure the Bank that the value of the work is at least sufficient to cover our payments to you.

(emphasis in original). The Letter also included a "material adverse changes" clause:

> It is a condition of this [Letter] that prior to the advance of any or all moneys hereunder, there be no material adverse change in the conditions, financial or otherwise, of the Borrower or the Guarantors from the conditions as set forth in support for this loan.

Finally, the Letter discussed a Draw Schedule that would outline the planned series of advances under the Loan based on the progress of construction:

> The "Draw Schedule" represents a guideline agreed to by both borrower and lender. The Bank in its sole discretion may alter the funding based upon work in

place and the needs of both borrower or the Bank to include, but not limited to, partial advances of the draws.

## 2. The Note

The Note detailed how Osborne Construction would make payments under the Loan, and

how Osborne Construction might default:

> BORROWERS FAILURE TO PAY AS REQUIRED.
> . . .
> If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(emphasis in original).  The Note was supplemented with a Construction Rider that included

more details about construction and the draw process:

> Borrower agrees to complete construction of the improvements within <u>NINE (9) months</u> from the date of this instrument . . . .
> . . .
> Borrower agrees to receive all advances as a trust fund to be applied solely for the construction of the improvements and related charges.

(emphasis in original).  Finally, the Note discussed Sterling's powers in the event of a default:

> In the event of a default under the terms of the Note, Mortgage, Construction Rider to Note, and [Construction Agreement], Borrower assigns to Lender all sums not yet advanced for use in completion of the improvements . . . .  For this purpose, Borrower designates Lender as attorney-in-fact with full power of substitution, which power shall be deemed to be coupled with an interest and irrevocable to . . . take do any act Borrower might do in connection with such construction.

## 3. The Construction Agreement

Like the Letter and the Note, the Construction Agreement also discussed the draw

process:

> Lender agrees to advance funds in accordance with the Construction Loan Schedule of Advances attached hereto and made a part hereof.  Lender shall be under no obligation to advance funds hereunder until Lender has obtained a

satisfactory inspection report from its own inspector, as Lender may require, indicating that sufficient construction has occurred to support the amount of the draw requested. . . . Borrower(s) further agree that any such inspection shall be for the use and benefit of Lender only and shall in no way be construed to warrant the quality of workmanship of any work performed.

The Construction Agreement further provided:

Construction of the improvements shall be completed according to the plans and specifications on file with the Lender. Any alterations to or deviations from said plans and specifications must be approved by Lender. Failure to satisfy this requirement shall constitute an event of default hereunder.

The Construction Agreement contained a list of covenants made by Osborne Contruction:

Contractor agrees and covenants as follows; (a) to complete the said improvements according to the plans and specifications on file with Lender within the time specified in the building contract; . . . (c) to pay all bills for labor and materials promptly when due . . . .

The Construction Agreement additionally included a nine-month completion clause similar to

that in the Note:

Borrower(s) specifically agree to complete construction of the improvements within **<u>NINE (9) MONTHS</u>** of the date of this Agreement, which time is of the essence. In the event construction is not completed within that time period, or should construction be discontinued for a period of thirty (30) consecutive days, it shall be considered an event of default hereunder unless Lender shall consent to an extension of said period. Any such extension shall be for a period not to exceed one hundred eighty (180) days.

(emphasis in original). Finally, the Construction Agreement discussed Osborne Construction's

obligation to use loan proceeds for construction, and Sterling's rights if an intervening lien was

placed on the Property during the term of the Loan:

Borrower(s) hereby agrees to be bound by each and every provision of this agreement and agrees that it will apply the amounts of money paid to it for the construction of the dwelling; that the property as defined in the mortgage shall not in any manner whatsoever be or become liable to any mechanic's or materialmen's liens, stop notices or any other claim or demand whatsoever. If

any mechanic's notice of intention, mechanic's or materialmen's liens, or stop notices should be filed, then the Borrower, or title company, shall not be obliged to make any advances then due or thereafter become due until a proper subordination or discharge is furnished. If such subordination or discharge is not furnished, then Borrower(s) may proceed to complete said dwelling and all sums of money paid by agreement, or at its option, Lender may elect to terminate this agreement and shall not be required to make any further advance or advances. In such event, at the further option of Lender, the said Note and Mortgage will become immediately due and payable.

**4. The Draw Schedule**

The Draw Schedule broke down the $950,000 Loan sum into two segments—$230,000 as a "Land Advance" to pay off the existing mortgage on the lot, and $720,000 to fund construction. The Draw Schedule then broke the $720,000 construction sum down further into six individual "draws," detailing how much of the loan would be allocated for discrete construction tasks. The Draw Schedule also repeated the following language from the Letter:

> This 'Construction Draw Schedule' represents a guideline agreed to by both the borrower and lender . . . . The bank, at its sole discretion, may alter the funding of these draws including, but not limited to, partial funding of the draw.
>
> As stated in the Commitment Letter, WE DO NOT INSPECT THE QUALITY OF THE WORK OR WHETHER IT IS EXACTLY TO THE PLANS AND SPECIFICATIONS YOU HAVE DELIVERED TO US. Inspections are performed to assure the Bank that the value of the work is sufficient to cover our payments to you under the draw schedule.

(emphasis in original).

**B. The Draw Process**

Initially, the Hunters were not involved with the draw process. Rather, in a signed Guaranty Agreement, the Hunters authorized Osborne to make all draw requests aside from the final draw. To obtain Loan funds, Osborne would submit a draw request to Sterling (a "draw"). Sterling processed each draw independently, in order to ensure that there were no intervening

liens placed on the Property. Sterling would then engage TEB Associates ("TEB") to inspect the Property. TEB would complete an inspection and submit a report (an "Inspection Report") to Interstate. Interstate would review the Inspection Report, and then send an Inspection/Funding Request ("Request") to Sterling. Once Sterling received a Request, it would send Title Company a check payable to "The Title Company of Jersey for WG Osborne LLC and William and Helen Hunter" (an "advance").[2] At this point, Title Company held possession of the advance. Osborne would then draw down the advance by requesting Title Company to disburse funds for specified construction costs (a "disbursal"). Osborne would continue to request disbursals until the entire advance was disbursed and a new draw was needed.

## C. The April 2007 Draw

Sterling made its first advance of $302,000 on January 17, 2007, the date of closing. Of this amount, Osborne construction used $243,000 to pay off the existing mortgage on the Property, $19,000 to pay the commitment fee, and $32,885 to begin construction.

Following the initial advance, Sterling processed and funded eight draws according to the draw process described in Part I.B, supra. On April 10, 2007, the normal draw procedure was upended, however, following Osborne's April 2007 draw request for $75,000. As Sterling was preparing to advance this amount, Helen Hunter contacted Title Company with specific disbursement instructions. Helen Hunter acknowledged that she was deviating from the previous practice of allowing Osborne to request disbursements himself.

---

[2] One check dated August 9, 2006 was made payable to "The Title Company of Jersey for WG Osborne Construction." Additionally, some checks swapped the listed order of the parties, naming the Hunters first and Osborne Construction second.

On April 11, 2007, Sterling mailed a $74,800 check payable to "The Title Company of Jersey, LLC for WG Osborne Construction and William and Helen Hunter."[3]  Attached to this check was a letter from Sterling to Title Company noting that the funds were to be disbursed as per Helen Hunter's instructions.  The April 2007 draw was disbursed as requested.

**D.  The June 2007 Draw and Inspection Report 11**

Following the April 2007 draw, Helen Hunter continued to participate in the draw process.  Osborne made the next and final draw request in June 2007.  Before funding this draw request, Sterling again engaged TEB Associates to inspect the property.  On June 15, 2007, TEB inspected the property and submitted an Inspection Report ("Inspection Report 11") to Interstate. Inspection Report 11 detailed the progress of construction, noting:

> At the time of this inspection the site was active.  The exterior siding on the units is complete.  On the interior of the units, the drywall has been completed in both units.  The unit known as #123 has more interior work complete with the painting trimwork, interior doors, some plumbing fixtures and flooring completed.

The Hunters argue that Inspection Report 11 was inaccurate because the flooring and interior doors were not actually complete when the related Request was submitted.

On June 28, 2007, after receiving Inspection Report 11, Sterling advanced $34,337.66 in a check payable to "The Title Company of Jersey, LLC for WG Osborne Construction and William and Helen Hunter."[4]  On that date, Helen Hunter sent Title Company a letter instructing them as to how to disburse the funds:

---

[3] The amount ultimately advanced by Sterling was not always equal to the amount Osborne initially requested, as Sterling needed to account for the costs including the cost of inspections.

[4] Although Osborne requested $40,200, Sterling deducted $200 for inspection costs, and $5,662.34 for an unspecified "customer payment."

give Bill Osborne payment for 6 subs as per out conversation. Include printing contractor as well for 121 E. Rosemary (A + P printing) $4,120. Please cut check to my husband for balance of painting for 123 E. Rosemary in the amount of $6,000. Also, a check to my husband for $2,200 for appliances which we already paid for.

Title Company disbursed funds from this draw over the next month largely in accordance with Helen Hunter's letter.

On July 9, 2007, Osborne requested two additional disbursements from the June 2007 draw, to pay two specific subcontractors. Before making the disbursements, Title Company spoke with Helen Hunter on the phone and obtained her approval. Only then did Title Company disburse the advance as Osborne requested.

**E.  Construction Funds Run Dry**

After June 28, 2007, Sterling made no more advances under the loan, although it extended the loan period until January 2008. By this point, according to the Draw Schedule, construction on the Property should have been complete. On August 28, 2007, TEB inspected the Property one final time. In its Inspection Report, TEB noted that Unit 123 was nearly complete. By July 31, 2007, Osborne and the Hunters had drawn a total of $861,388.23 on the $950,000 Loan, with $88,611.77 not yet advanced. Sterling contends that $118,730.78 should still have been available to complete construction, including the remaining $88,611.77 that had not been advanced, $28,885.81 that had been used to pay interest payments and extension fees rather than construction costs, and $1,233.20 that had been used to pay an unrelated medical bill.

The parties dispute how much it would cost to complete construction. The Hunters estimate that only $89,783 was required. Osborne estimates that it would require between $100,000 and $110,000. Both of these estimates are larger than the $88,611.77 remaining on the

9

Loan, but are below the $118,730.78 that Sterling argues should have been available under the Loan.

**F.  The Hunters' Failed Attempt to Complete Construction**

The Hunters engaged attorney Keith Bonchi ("Bonchi") to represent them in negotiations with Sterling to draw the remaining funds under the loan in order to complete construction.  On October 2, 2007, Bonchi sent Sterling an Addendum to the Joint Venture Agreement that gave the Hunters total control over the joint venture, and gave them full authority to take any action necessary to complete the project.  On October 8, 2007, Bonchi sent Sterling a letter requesting a direct payment to a subcontractor.  In this letter, Bonchi also alleged that Sterling had been disbursing funds improperly.  Sterling responded that it does not get involved in disbursing funds to subcontractors.  Sterling also noted that it disbursed funds as requested, and that the dispute over the propriety of the disbursements was a "classic 'partnership' problem" between the Hunters and Osborne, not involving Sterling.

On December 11, 2007, Bonchi again wrote Sterling, requesting that Sterling refrain from foreclosing on the property while the Hunters applied for home equity loans on their other real properties in order to complete construction.  The Hunters could not obtain a home equity loan, and on February 12, 2008, Sterling accelerated the Loan.  On February 25, 2008, within days of being notified of this acceleration, the Hunters filed the instant Complaint.

**II.  LEGAL STANDARD**

Summary judgment will be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  There is a

"genuine" issue of material fact if the evidence would permit a reasonable jury to find for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The "mere existence of a scintilla of evidence" is insufficient. Id. at 252.

The moving party must make an initial showing that there is no genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The non-movant must then "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322; see also Fed. R. Civ. P. 56(e)(2). The non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In determining whether the non-moving party has established each element of its case, the court must draw all reasonable inferences in the non-moving party's favor. Id. at 587.

## III. DISCUSSION

Sterling moves both for Summary Judgment against the Hunters' Complaint, as well as in favor of its Counterclaim. I consider these two motions separately.

### A. The Hunters' Complaint

In their Complaint, the Hunters allege the following six causes of action: (1) conversion; (2) breach of fiduciary duty; (3) negligence; (4) breach of contract; (5) detrimental reliance; and (6) equitable relief. The Hunters raised each of these claims, except for the negligence claim,

against all of the defendants in this case.  The Hunters raise their negligence against Sterling, Title Company, and Interstate.  Only Sterling has moved for summary judgment.[5]

## 1. Breach of Contract

"To state a claim for breach of contract, [a plaintiff] must allege (1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party stating the claim performed its own contractual obligations."  Frederico v. Home Depot, 507 F.3d 188, 203 (3d Cir. 2007) (applying New Jersey law).[6]

The Hunters claim that Sterling committed six breaches: (1) a duty to refrain from advancing funds if construction was not proceeding according to plan; (2) a duty to decline to advance Funds not used for construction on the Property; (3) a duty to assume Osborne Construction's responsibilities upon default; (4) a duty to ensure that Osborne Construction timely paid its bills; (5) a duty to ensure that Osborne Construction received disbursements as a trust fund; and (6) a duty to stop advancing funds upon a material adverse change to Osborne Construction's condition.  The Hunters allege that these breaches arise out of four of the contracts signed at the Loan's closing:  the Letter, the Draw Schedule, the Construction Agreement, and the Note (collectively, the "Agreements").  It is undisputed that the Agreements were valid and binding contracts.  Rather, Sterling disputes whether those contracts actually

---

[5] Defendants Title Company and Interstate previously filed Motions to Dismiss which were resolved in a November 13, 2008 Memorandum and Order (Doc. 34).  In that Memorandum and Order, I dismissed all of the claims against Title Company and Interstate except for the Hunters' negligence claim and their breach of contract claim.  See Hunter v. Sterling Bank, 588 F. Supp. 2d 645 (E.D. Pa. 2008).

[6] I have previously held that because the Property is situated in New Jersey, and all transactions took place in New Jersey, New Jersey law governs.  See Hunter, 588 F. Supp. 2d at 650 n.1.

created the duties which the Hunters claim have been breached, and whether Sterling breached those duties.

In order to determine whether a contractual duty exists, the court must examine the language of the contracts at issue. In New Jersey, "[t]he polestar of contractual interpretation is the intent of the parties and [t]he starting point in ascertaining that intent is the language of the contract." Tauriello v. Twp. of Edison, 288 Fed. Appx. 825, 828 (3d Cir. 2008) (internal quotation marks omitted) (quoting Commc'ns Workers of Am. v. Monmouth County Bd. of Soc. Servs., 476 A.2d 777, 781-82 (N.J. 1984)). "[T]he terms of a contract are decided by the court as a matter of law unless the meaning is both unclear and dependent on conflicting testimony." Bosshard v. Hackensack Univ. Med. Ctr., 783 A.2d 731, 740 (N.J. Super. Ct. App. Div. 2001). "[I]f the relevant terms in a contract are ambiguous, the issue must go to a jury." Emerson Radio Corp. v. Orion Sales, Inc., 253 F.3d 159, 163 (3d Cir. 2001) (applying New Jersey law). "An ambiguity in a contract exists if the terms of the contract are susceptible to at least two reasonable alternative interpretations." M.J. Paquet, Inc. v. N.J. Dept. of Transp., 794 A.2d 141, 152 (N.J. 2002) (quoting Nester v. O'Donnell, 693 A.2d 1214, 1220 (N.J. Super Ct. App. Div. 1997)). However, the "court should not torture the language of [a contract] to create ambiguity." Nester, 693 A.2d at 1220.

For each alleged breach, I consider whether the language is ambiguous and could reasonably be understood to create a duty, and if unambiguous whether the language creates a duty that Sterling may have breached.

*(a) Duty to refrain from advancing funds if construction was not proceeding according to the plan on file*

First, the Hunters claim that the Agreements required Sterling to advance funds "such that the construction of improvements shall be completed according to the plan and specifications on file with the lender." (Pls.' Resp. to Df.'s M. for Summ. J. 24 (internal quotation marks omitted)). That is, the Hunters claim that Sterling was obligated to stop advancing funds if construction was not proceeding according to plan on file. Sterling responds that "there is no language in either [the Commitment Letter or the Draw Schedule] which obligates Sterling to do anything, other than to make minimum advances under the Draw Schedule at least for work which has actually been completed." (Def. Mot. for Summ. J. 30).

In response, the Hunters suggest language in the Letter and the Draw Schedule that purportedly limits Sterling's authority to disburse funds. Specifically, the Letter and the Draw Schedule provide that Sterling does "not inspect the quality of the work or whether it is exactly to the plans and specifications . . . . Inspections are performed to assure the Bank that the value of the work is at least sufficient to cover our payments to you." The Hunters argue that the term "exactly" implies that Sterling was obligated to inspect construction in some capacity, but they only had to assess whether construction was proceeding <u>generally</u> according to plan, not <u>exactly</u> according to plan.

When reading a contract, the court must "consider the entire instrument and attempt to reconcile all of its provisions in order to determine the meaning intended to be given to any portion of it. Moreover, the meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the

agreement's overall scheme or plan." In re Stone & Webster, Inc., 558 F.3d 234, 246 (3d Cir. 2009). The relevant clause explicitly states that these inspections are performed "to assure the Bank" of the value of the construction—that is, the inspections are designated for Sterling's benefit. The Construction Agreement emphasized this point in stronger terms, stating: "Borrower(s) further agree that any . . . inspection shall be for the use and benefit of Lender only . . . ." Considered in the context of the entire agreement, this clause cannot reasonably be read to obligate Sterling.

The Hunters also claim that the Construction Agreement's requirement that "[c]onstruction of the improvements shall be completed according to the plans and specifications on file with the Lender" obligated Sterling to keep a plan on file. This argument requires a purposely convoluted reading of the clause. The clause when read naturally obligates the developer, Osborne Construction, to complete construction in accordance with the plans and specifications that it provided to the Lender. The clause does mention that these plans and specifications will be kept "on file" will the Lender, but this does not create a contractual duty. Rather, this language appears in a Construction Agreement that sets out the guidelines governing the developer's construction on the Property—to find that this particular undirected phrase now binds Sterling would run counter to the meaning of the agreement. The Construction Agreement makes this clear, stating: "Borrower(s) hereby agrees to be bound by each and every provision of this agreement." (emphasis added). Because the Hunters have not identified a contractual duty underlying this claim, I will dismiss this claim as to Sterling.

*(b) Duty to advance funds only for use on the Property*

Second, the Hunters claim that the Agreements obligated Sterling to advance money only for construction on the Property. The Hunters claim that Sterling breached this duty by advancing funds to Osborne Construction that may have been commingled with other funds. As a result, Osborne Construction may have used Loan proceeds to pay for other jobs. The Hunters argue that because Sterling was aware, or should have been aware, that Osborne Construction was commingling funds from various projects, Sterling should have stopped advancing Loan funds. The Hunters rest this claim on the Letter, which provides that "[t]he proceeds of this loan will be used solely for the construction of the above captioned property . . . ."

This clause cannot reasonably be read to obligate Sterling to oversee Osborne Construction's use of the funds. Rather, the use of the passive phrase "will be used" suggests that the contract instead obligates Osborne Construction to use the funds for an appropriate purpose. This is in contrast to the next half of the clause which very clearly creates an obligation for Sterling, noting that "all construction loan proceeds will be disbursed on an inspection draw basis." No reasonable factfinder could conclude that the former clause obligated Sterling to decline to advance Loan proceeds to Osborne Construction because of Osborne Construction may have been commingling funds. I will therefore dismiss this claim as to Sterling.

*(c) Duty to assume Osborne Construction's responsibilities upon default*

Third, the Hunters claim that because Osborne Construction defaulted under the Agreements by failing to complete construction within nine months of closing, Sterling became Osborne Construction's "attorney-in-fact" and assumed Osborne Construction's obligations. The Hunters rely on the Construction Agreement, which provides:

[Osborne Construction] specifically agree[s] to complete to construction of the improvements within **NINE (9) MONTHS** of the date of this Agreement, which time is of the essence.
. . .

In the event of a default by Borrower(s) or Contractor under the terms of this Agreement, Sterling . . . may take steps to protect and complete the improvements . . . . Pursuant to this right, Borrower(s) hereby designate Lender as their Attorney-in-fact with full power of substitution . . . to take any action required under the terms of a surety bond and to do any other act Borrower(s) might do in connection with said construction.

(emphasis in original).

This language does not obligate Sterling to do anything. Rather, the clause is permissive, stating that "Sterling . . . may take steps to protect and complete the improvements." Sterling is designated Osborne Construction's Attorney-in-fact, but only "[p]ursuant to [Sterling's] right" to protect its investment and complete construction. In other words, the Construction Agreement empowers Sterling to act as Osborne Construction's Attorney-in-fact, but does not obligate Sterling to do so. By not assuming Osborne Construction's role upon default, Sterling thus did not violate any contractual duty, and I will dismiss this claim as to Sterling.

*(d) Duty to ensure that Osborne Construction timely paid its bills*

Next, the Hunters argue that Sterling breached the Agreements by ignoring Osborne Construction's failure to timely pay bills for labor and materials. The Hunters presumably rely on Paragraph 9 of the Construction Agreement for this assertion, which states that "Contractor agrees and covenants . . . to pay all bills for labor and materials promptly when due . . . ."

This clause creates no obligation on Sterling's part. The contract unambiguously obligates Osborne Construction, not Sterling, to timely pay its bills. The clause does not even reference Sterling. There is no language supporting the Hunters' construction of this clause, and

17

the clause thus creates no duty for Sterling to breach. I will therefore dismiss this claim as to Sterling.

*(e) Duty to ensure that Osborne Construction received advances as a trust fund*

The Hunters also argue that Osborne Construction was obligated to place loan proceeds in a trust fund. This argument arises out of the Note, which states that "Borrower agrees to receive all advances as a trust fund to be applied solely for the construction of the improvements and related charges." The Hunters argue that by continuing to advance money when it knew, or should have known that Osborne Construction was receiving funds in a commingled account, Sterling breached this duty. This clause again does not bind Sterling. No reasonable factfinder could construe this clause to obligate Sterling to do anything. Rather, the clause is directed towards Osborne Construction. As such, there is no contractual duty underpinning this breach claim, and I will dismiss this claim as to Sterling.

*(f) Duty to halt advancements upon a material adverse change to Osborne Construction's condition*

The Hunters finally claim that Sterling had a duty to halt advances upon a material adverse change to Osborne Construction's financial condition. This duty derives from the Letter that was drafted by Sterling and sent to Osborne and the Hunters for their signature. (Def.'s Ex. C, Commitment Letter). The Letter outlined Osborne and the Hunters' duties and liabilities before receiving the Loan. The relevant language appears in the section of the Letter discussing Osborne Construction's indebtedness, and what might occur if Osborne Construction defaulted on the Loan. This section provides that "[i]t is a condition of this Commitment that prior to the advance of any or all moneys hereunder, there be no material adverse change in the conditions,

financial or otherwise, of the Borrower or the Guarantors from the conditions as set forth in support for this loan." The Hunters argue that Osborne Construction's failure to pay its bills starting in August 2006, and the accompanying intervening liens, were evidence of such a material adverse change, and that by failing to notify the Hunters and continuing to advance money under the Loan through July 2007, Sterling breached the Agreements.

There is no language in this clause that indicates that the clause obligated Sterling to refrain from advancing money upon a material adverse change. Instead, the clause empowers Sterling to deny an advance after a material adverse change. This is the only reasonable reading of the clause when it is considered in the context of the whole Letter. The Letter was drafted by Sterling and sent to Osborne and the Hunters, outlining their duties and liabilities under the loan agreement. Moreover, the placement of the clause in the section outlining Sterling's rights upon default counsels that the clause was meant to protect Sterling from being forced to advance funds after a default. When considered as a whole, this clause cannot be reasonably read to create a duty for Sterling. I will dismiss this breach of contract claim as to Sterling.

### 2. Economic Loss Doctrine

Sterling argues that all of the Hunters' non-contract claims are barred under New Jersey's economic loss doctrine. "The economic loss doctrine may bar the Hunters from seeking damages under tort if . . . [the Defendants'] duties emanate from contractual relationships." Hunter, 588 F. Supp. 2d at 652. In other words, if a defendant breaches a duty that arises out of a contractual relationship, a plaintiff cannot recover for that breach under a tort theory, and must instead recover through a contract claim.

No New Jersey court has specifically held that the economic loss can preclude a tort claim where the parties maintain a strictly contractual relationship, but where the plaintiff's tort claims are premised on duties that do not actually arise from the contract.[7]  Nonetheless, the reasoning behind the doctrine suggests that the doctrine should bar under the Hunters' tort claims here, where the sole bases for their tort claims, aside from their meritless claim of fiduciary duty, see note 7, do not exist in the contract, but deal with the same subject matter as the contract.  New Jersey courts have emphasized that the purpose of the doctrine is to "prohibit[ ] plaintiffs from recovering in tort economic losses to which their entitlement only flows from a contract." Titan Stone, Tile & Masonry, Inc. v. Hunt Constr. Group, Inc., 2007 WL 174710, at *3 (D.N.J. Jan. 22, 2007); Travelers Indem. Co. v. Dammann & Co., 594 F.3d 238, 248 (3d Cir. 2010) ("New Jersey courts have consistently held that contract law is better suited to resolve disputes between the parties where a plaintiff alleges direct and consequential losses that . . . could have been the subject of their negotiations."); Slim CD, Inc. v. Heartland Payment Sys., 2007 U.S. Dist. LEXIS 62536, at *25 (D.N.J. Aug. 22, 2007) ("Under New Jersey law, a tort remedy does not arise from a contractual relationship unless the breaching party owes an

_____

[7] The issue is the Hunters' claim that Sterling owed them a fiduciary duty arising from this contract.  New Jersey courts have suggested that a tort claim premised on a legal duty independent from the duties arising from the contract will survive the economic loss doctrine. Saltiel v. GSI Consultants, Inc., 788 A.2d 268, 277 (N.J. 2002) ("under New Jersey law a party cannot maintain a negligence action, in addition to a contract action, unless the plaintiff can establish an independent duty of care.").  Thus the question is whether a fiduciary duty that arises from the contract imposes a duty independent from the contract.  At least one court has suggested that a fiduciary duty that arises out of a contractual relationship does not constitute an "independent duty of care" sufficient for the economic loss doctrine to attach. Glenz v. RCI, LLC, 2010 U.S. Dist. LEXIS 4212, at *16 (D.N.J. Jan. 20, 2010) ("Plaintiff's breach of fiduciary duty claim is barred by the economic loss doctrine because it flows directly from the parties' contract.").  Because I ultimately find that no fiduciary relationship actually exists between Sterling and the Hunters, see infra Part III.A.4, I do not need to reach this issue.

20

independent duty imposed by law." (quoting Saltiel v. GSI Consultants, Inc., 788 A.2d 268, 277 (N.J. 2002))).   In other words, the economic loss doctrine is meant to prevent plaintiffs from recovering on tort claims where their relationship with a defendant "only flows from a contract," and thus should be litigated as a contract claim.  See also Hunter, 588 F. Supp. 2d at 652 (holding that the economic loss doctrine may bar recovery if the Defendants' "duties emanate from contractual relationships."); Shinn v. Chamption Mortgage Co., 2010 U.S. Dist. LEXIS 9944, at *12 (D.N.J. Feb. 5, 2010) ("The economic loss doctrine provides that a tort remedy does not arise from a contractual relationship unless the breaching party owed an independent duty imposed by law."); Martino v. Everhome Mortgage, 639 F. Supp. 2d 484, 494 (D.N.J. 2009) (dismissing a negligence claim because the parties were in a contractual relationship, and "a [tort claim] is not the appropriate vehicle to remedy [the] injury."); cf. Gleason v. Northwest Mortgage Inc., 243 F.3d 130, 144 (3d Cir. 2001) (holding that the key question in deciding whether the economic loss doctrine applies to a negligence claim is whether the negligence was "extrinsic" to the subject matter of the contract).

There is no doubt that the relationship between Sterling and the Hunters is strictly contractual.  Both parties signed several valid and binding contracts, and the Hunters have offered no evidence of any pre-existing relationship, or any relationship outside of the contractual agreements.  Sterling also owes the Hunters no legal duties independent from the Agreements.  Under the logic of the economic loss doctrine, the Hunters should not be allowed to recover for the breach of an alleged duty that is intrinsic to the subject matter of the Agreements.  Rather, the Hunters should be restricted to recovering for breaches of the contractual duties that they bargained for in the Agreements, and for breaches of any

independent legal duties.  Moreover, as the Third Circuit has noted, "even if we were torn between two competing yet sensible interpretations of [state] law . . . we should opt for the interpretation that limits liability, rather than expands it, until the [state's] Supreme Court . . . decides otherwise."  Werwinski v. Ford Motor Co., 286 F.3d 661, 680 (3d Cir. 2002) (discussing Pennsylvania's economic loss doctrine).

Here, the logic used by the New Jersey courts suggests that the economic loss doctrine precludes recovery under the Hunters' tort claims—the interpretation of New Jersey law that "limits liability, rather than expands it."  Id.  Specifically, the economic loss doctrine precludes recovery under the Hunters' claim for conversion and negligence.  See Cargill Global Trading v. Applied Dev. Co., 2010 WL 1568457, at *13-14 (D.N.J. Apr. 21, 2010) (holding that the economic loss doctrine will preclude conversion claims arising out of a contractual relationship); Gleason, 243 F.3d at 144 (holding that New Jersey's economic loss doctrine precludes a negligence claim premised on conduct intrinsic to a contractual relationship); Walker Rogge, Inc. v. Chelsea Tit. & Guar. Co., 562 A.2d 208, 218-19 (N.J. 1989) (applying the economic loss doctrine to a negligence claim).  Nonetheless, because New Jersey law is not fully settled on the reach of the economic loss doctrine in this context, I also consider the merits of the Hunters' remaining claims.

### 3. Conversion

"Under New Jersey Law, the elements of conversion are '(1) the existence of property, (2) the right to immediate possession thereof belonging to plaintiff, and (3) the wrongful interference with that right by defendant.'"  Hunter, 588 F. Supp. 2d at 652 (quoting Corestar Int'l PTE, Ltd. v. LPB Commc'n, 513 F. Supp. 2d 107, 127 (D.N.J. 2007)).  The Hunters do not

clarify the basis for their conversion claim. Presumably, the Hunters claim that the disbursements of the Loan were their property, and that Sterling wrongfully converted the property by improperly advancing loan funds at Osborne's direction.

As I previously held, however, "[t]he Hunters have not stated a claim for conversion because the complaint does not support their right to immediate possession of the funds . . . ." Id. at 650. The Loan funds, however, were subject to the draw process spelled out in the Agreements. Moreover, the Hunters authorized Osborne to draw upon the Loan, and to request disbursements. I previously held that "[i]n fact, the Hunters lacked any right to possession over the funds; the loan was approved only as a construction loan." Id. at 651 (emphasis added). Because the Hunters have presented no evidence which could establish a right to the Loan funds, I will dismiss their conversion claim (Count I).

### 4. Breach of Fiduciary Duty

In order to make out a claim for breach of fiduciary duty, a plaintiff must first establish that the breaching party owed the plaintiffs a fiduciary duty. Hunter, 588 F. Supp. 2d at 651. "Whether a duty exists is a matter of law, to be decided by the court, not the factfinder." Siddons v. Cook, 887 A.2d 689, 692 (N.J. Super. Ct. App. Div. 2005). "Under New Jersey law, a fiduciary relationship exists when one party is 'under a duty to act for or give advice for the benefit of another on matters within the scope of their relationship." Hunter, 588 F. Supp. 2d at 651 (quoting F.G. v. MacDonell, 696 A.2d 697, 704 (N.J. 1997)). "[T]he presumption that there is no fiduciary duty between a borrower and a lender has been universally embraced by New Jersey courts . . . [because] it would be, as other courts have noted, antithetical to the often adversarial and contentious nature of the borrower-lender relationship to impose a fiduciary duty

on the lender." Patetta v. Wells Fargo Bank, N.A., 2009 WL 2905450, at *8 (D.N.J. Sept. 10,

2009); see also Paradise Hotel Corp. v. Bank of Nova Scotia, 842 F.2d 47, 53 (3d Cir. 1988)

("creditor-debtor relationships such as that between the Bank and [the borrower] rarely are found

to give rise to a fiduciary duty. It would be anomalous to require a lender to act as a fiduciary

for interests on the opposite side of the negotiating table, because . . . their respective positions

are essentially adversarial." (internal quotation marks and citations omitted)); United Jersey

Bank v. Kensey, 704 A.2d 38, 44 (N.J. Super. Ct. App. Div. Dec. 23, 1997) ("We have said that

there is no presumed fiduciary relationship between a bank and its customer. . . . The virtually

unanimous rule is that creditor-debtor relationships rarely give rise to a fiduciary duty.").

> The facts here mirror those in Patetta, where the court held:

> Here, bald assertions that a duty was owed will not carry the day. Plaintiffs do
> not identify any exceptional facts, or case law for that matter, that would support
> taking their breach of fiduciary duty claim out of the heartland of those in which
> courts have consistently declined to impose a fiduciary duty upon a lender. As
> alleged in the Complaint, the negotiation and arrangement between the Plaintiffs
> and their lender was conducted at arms-length. Nothing in the Complaint
> suggests otherwise . . . . Without allegations to that effect, such as an explicit
> understanding between Defendants and Plaintiff that Defendants and their agents
> were acting and giving advice for the benefit of Plaintiffs, Plaintiffs' Complaint
> cannot overcome the heavy presumption that a lender-borrower arrangement is
> not ordinarily a special relationship subject to a fiduciary duty.

Patetta, 2009 WL 2905450, at *8. Here, the Hunters provide no evidence of any exceptional

facts that could justify a fiduciary duty claim. Rather, this seems to be the same type of "arms-

length transaction[s]" that the Hunters engaged in with Interstate and Title Company, which I

previously held were insufficient to create a fiduciary relationship. Hunter, 588 F. Supp. 2d at

651.

The Hunters claim that <u>Patetta</u> is inapposite because the instant transaction was not conducted at arms-length. Specifically, they focus on the fact that they were merely guarantors, and had ceded control over the negotiations to Osborne. This argument fundamentally misunderstands the concept of an arms-length transaction. Such a transaction does not necessarily require that the parties both be the primary negotiators of the agreement, but instead requires that the agreement be negotiated in good faith with no self-dealing, where the parties can fairly price the relevant goods and services. <u>See</u> <u>Holiday Med. Ctr., Inc. v. Weisman</u>, 2008 WL 2677504, at *4 (N.J. Super. Ct. App. Div. July 10, 2008). Here, the Hunters present no evidence of wrongdoing during negotiations. They present nothing to suggest that they were duped into signing the Agreements, or that Sterling hid information either from them or from Osborne. The transaction may have been facilitated by Osborne, but the Hunters have presented no reason to question the Agreements that the Hunters ultimately signed. Because there is no reason to doubt that the transaction was conducted at arms-length, New Jersey's general rule that Lenders owe no fiduciary duty to borrowers applied in this case. I will grant Sterling's Motion as to the Hunters' Breach of Fiduciary Duty claim (Count II).

**5. Negligence**

In New Jersey, "[a] party alleging negligence must establish three elements: (1) a duty owed by the defendant to the plaintiff, (2) a breach of that duty by the defendant, and (3) the breach of that duty was the proximate cause of plaintiff's damages." <u>Raimo v. 3332-34 West Ave. Condo. Ass'n</u>, 2010 WL 1189781, at *5 (N.J. Super. Ct. App. Div. March 26, 2010) (citing <u>Siddons</u>, 887 A.2d at 696). The Hunters have only alleged a fiduciary duty, and contractual duties arising out of the Agreements. As discussed in Part III.A.1 <u>infra</u>, none of the contractual

duties that the Hunters point to can reasonably be inferred from the Agreements.[8]  Similarly, as

discussed in Part III.A.4 <u>infra</u>, Sterling did not owe a fiduciary duty to the Hunters.  The Hunters

have provided no evidence of any other relationship that might give rise to an independent duty.

Because they cannot make out any of their alleged duties, the Hunters cannot establish any of the

elements of negligence.  I will therefore grant Sterling's Motion as to this claim (Count III).

**6. Detrimental Reliance**

As discussed in my previous Opinion, the Hunters' detrimental reliance claim is

equivalent to a claim for promissory estoppel.  <u>Hunter</u>, 588 F. Supp. 2d at 652 (citing <u>Madison</u>

<u>Fin., LLC v. Hunts Point Co-Op Mkt.</u>, 2008 WL 724362, at *13 (D.N.J. Mar. 17, 2008)).  A

promissory estoppel claim requires "(1) a clear and definite promise by the promisor; (2) the

promise must be made with expectation that the promisee will rely thereon; (3) the promisee

must in fact reasonably rely on the promise; and (4) detriment of a definite and substantial nature

must be incurred in reliance on the promise."  <u>Id.</u>

In New Jersey, a promissory estoppel claim will not survive where the alleged promise

was made in the context of a contractual relationship.   <u>Jones v. Marin</u>, 2009 U.S. Dist. LEXIS

74139, at *17 (D.N.J. Aug. 20, 2009) (a promissory estoppel claim "cannot be maintained where

a valid contract fully defines the parties' respective rights and obligations."); <u>In re Bayonne</u>

<u>Med. Ctr., Inc.</u>, 2009 Bankr. LEXIS 1002, at 57 (Bankr. D.N.J. ) (applying New Jersey law and

dismissing a claim of promissory estoppel because "a valid contractual agreement exists to

---

[8] Even if the Hunters were bound by one of the Sterlings' alleged contractual duties, the breach of that duty would properly be the subject of a breach of contract claim, and could not simultaneously justify a tort claim for negligence, where the negligence claimed would simply be the breach of that contractual duty.  <u>See</u> <u>Hunter</u>, 588 F. Supp. 2d at 652 (discussing the economic loss doctrine).

govern the parties' relations."); cf. Shalita v. Twp. of Wash., 636 A.2d 568, 572 (N.J. Super. Ct. App. Div. 1994) ("the parties are bound by their agreement, and there is no ground for imposing an additional obligation where there is a valid unrescinded contract that governs their rights.").

The Hunters point to no evidence that Sterling made any promises that were outside of their contractual agreements that might serve as the basis for a promissory estoppel claim. As a result, their relationship with Sterling is governed exclusively by: (1) the promises in the contract; and (2) any independent legal duties. Because all of Sterling's promises in this case arise out of its contractual relationship with the Hunters, their claim for promissory estoppel cannot survive.[9] I will thus grant Sterling's Motion as to this claim (Count V).

### 7. Equitable Relief

Where genuine factual issues remain unresolved, a claim for equitable relief may survive. See Koch Mats. Co. v. Shore Slurry Seal, Inc., 2005 WL 147061, at *5 (D.N.J. 2005) (summary judgment on equitable relief claim was inappropriate where genuine factual disputes remained). It is a settled principle in New Jersey, however, that "[w]here there is no wrong, there is no basis for equitable relief." Mooney v. Provident Sav. Bank, 705 A.2d 816, 820 (N.J. Super. Ct. Ch. Div. 1997). The Hunters have not specifically identified grounds which might justify equitable relief here. No genuine issues of material fact remain as to any of the Hunters' contract or tort

---

[9] The preclusion inquiry in the promissory estoppel context is distinct from the economic loss doctrine. The economic loss doctrine looks primarily at whether a tort claim emanates from a contractual duty or an independent legal duty, such as a fiduciary duty. See supra Part III.A.2. Whether an independent legal duty exists is not relevant in the context of a promissory estoppel claim, which centers around a clear and definite promise, as opposed to a general legal duty. As such, even if an independent legal duty did exist here, the Hunters' promissory estoppel claims would fail because they provide no evidence of a promise made apart from their contractual Agreements.

claims, that might serve as the basis for their equitable relief. The Hunters have provided no

evidence of wrongdoing, and thus have not presented a basis for any equitable relief. I will

therefore grant Sterling's Motion as to this claim (Count VI).

## B.  Sterling's Counterclaim

Sterling also moves for Summary Judgment in favor of its Counterclaim for the Hunters'

breach of the contract. Sterling notes that there is no dispute over the binding effect of the

Agreements. Sterling reasons that if summary judgment is granted as to the Hunters' Complaint,

no issues of fact remain as to its Counterclaim. In their Answer, the Hunters asserted the

following defenses: (1) estoppel; (2) laches; (3) unclean hands; (4) waiver; and (5) there is no

merit to the counterclaim because of Sterling's breach of contract or tortious conduct.

"To state a claim for breach of contract, [a plaintiff] must allege (1) a contract between

the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party

stating the claim performed its own contractual obligations."  Frederico, 507 F.3d at 203.  There

is no dispute that the Agreements constituted a valid, binding contractual agreement. There is

also no dispute that Osborne Construction stopped making payments under the Agreements.

Two questions remain unanswered: (1) whether the Hunters have breached the

Agreements as a result of Osborne Construction's non-performance; and (2) the amount of

damages from any breach by the Hunters. First, while the parties concede that Osborne

Construction have stopped making payments under the loan, Sterling has not established why

Osborne Construction's breach implies that the Hunters, as mere guarantors, have also breached

the Agreements. Similarly, damages remain an open issue. Sterling presents an affidavit stating

that there is a total of $1,067,220.64 outstanding under the Loan. This does not, however,

conclusively establish the amount of damages as a matter of law.  Moreover, Sterling has not

sufficiently briefed the issue how liability should be apportioned given that Osborne

Construction was the actual borrower, and that Osborne was a guarantor along with the Hunters.

At this stage in the litigation, these remain open questions that cannot be resolved as a matter of

law.  I will therefore deny Sterling's Motion for Summary Judgment in favor of its

Counterclaim.



s/Anita B. Brody

_____

ANITA B. BRODY, J.


Copies **VIA ECF** on _____ to:          Copies **MAILED** on _____ to: